COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT DEPARTMENT
                                                  CIVIL ACTION NO. 09-CV-3791

JOHN GRAY,

v.

DIANE TACASON and DJAYGEE INC.

### FINDINGS AND ORDER ON CONTEMPT

This matter came before this Court on the verified Complaint for Contempt filed by plaintiff, John Gray ("Gray") against Diane Tacason ("Tacason") and Djaygee, Inc. ("Djaygee"). After a two day hearing on July 7 and 8, 2010 at which both parties were present, represented by counsel and given the opportunity to be heard, this Court makes the following findings and rulings.

**1. Procedural History**

This Court (Inge, J.) entered an Order dated October 9, 2009 requiring that within ten days thereof Tacason and Djaygee transport all sports and music memorabilia and all hockey and basketball jerseys in their possession and not for use in the current season to a location reasonably convenient to all parties, and Tacason and Gray shall equally divide same by selecting, one by one, items of their choosing until all items are divided.

Gray filed a complaint for contempt, arguing that Tacason had failed to comply with the Court's Order. A hearing was held before the Court (Inge, J.) on November 5, 2009, after which this Court ruled: "Defendant Tacason was sworn and did testify that she did not comply with the October 9, 2009 order of the court. Offered in justification for her failure to comply, the defendant testified that her attorney was filing a motion for reconsideration. At the time of the execution of the order, however, there was no motion for stay of execution before the court. The court does not find that this rises to the level of contempt, see Birchall, petitioner, 454 Mass. 837

1

(2009) and will not hold a trial on the merits of the contempt complaint. However, based on the defendant's admission this court orders that she pay the plaintiff's attorney's fees and costs in preparing for the November 5, 2009 hearing on contempt."

The Court also modified its October 9, 2009 order as follows: "the jerseys that are to be divided are all jerseys that existed on the premises of Djaygee, inc. as of March 20, 2008 and which are not held in trust or bailment." No particular mechanism was established to detemine which items were in fact held in bailment at that time.

Findings of Fact.

Based on the evidence I deem credible, together with reasonable inferences drawn therefrom, I find the following facts:

Despite this Court's clear and unequivocal (and quite frankly, reasonable and sensible) order, creating a system for dividing property between the parties, Tacason and Djaygee[1] did not participate in the process created to redivide the jerseys. They offered in mitigation that they proposed several dates and that it was Gray who refused to redivide. This Court does not find this claim to be credible. While this Court does credit that Gray may have engaged in some gamesmanship of his own regarding the scheduling of this process, the fact is that Gray did appear, via an emissary, to participate in the process set forth for the division of the property. However, in multiple ways, Tacason did not comply with this Court's orders and in fact engaged in numerous tactics to stall, interfere with, prevent and ultimately thwart this Court's orders.

Tacason has asserted that the majority of jerseys in her possession were being held in trust or bailment for the respective teams and therefore they were not hers to divide. It is true that a number of teams have expressed, in response to inquiries from Tacason, that they wish their property returned to them or continued to be held by Djaygee until further notice.

---

[1] For the sake of simplicity, this Court will refer to the two defendants as "Tacason" inasmuch as there is no dispute that she is the principal and was the person in charge of executing the Court's orders on behalf of Djaygee.

2

However, there are numerous teams whose overstock jerseys remain at Djaygee. It is unclear to the Court whether or not the remaining teams want these jerseys kept at Djaygee or returned to them or left to be disposed of by Djaygee as it sees fit (which in this case, would involve dividing them between the parties.)

This Court finds that prior to March 20, 2008 both Tacason and Gray treated the overstock jerseys (defined herein as the jerseys not for use in the current sports season), which the parties had been collecting for seventeen (17) years, as their own personal property. Both parties regularly bartered the jerseys for things of value. Gray introduced several photographs into evidence which confirmed this practice in which jerseys were provided to celebrities, politicians and businesspersons in exchange for things of value and access to VIP events.

The fact that these two principals have regularly violated their obligations as bailees and that there have been no complaints from teams (whose busy representatives would hardly be expected to monitor the status of their jerseys), does not make the property theirs.

In support of the claim that the bulk of the overstock jerseys are held in bailment for the teams, Tacason introduced letters from a variety of sports teams (Exhibits 26, 27, 28, 29 and 33) setting forth, in substance, that the overstock jerseys acquired by Djaygee over the past seventeen years belong to the teams and not to Djaygee. The communications, by letter or email, are quite powerful and make the point. For example, the President of the Wilkes-Barre/Scranton Penguins wrote to Djaygee: "…The jerseys that you have in your possession were paid for by the WBS Penguins and were to be warehoused by Cutting Edge Sports in the event of an emergency player recall or reassignment. We were told at the end of every season all unused jerseys were returned to our equipment manager for future use by the team. If this was not done, we request that you return any and all WBS Penguins jerseys…" The Assistant Athletic Director of the Northeastern Huskies wrote "I have recently been informed of a situation regarding some of our inventory which is very concerning…Please be aware that the jerseys that

3

you currently have in stock for Northeastern Athletics have been paid for by our University and are our possession. If the jerseys were used for any purpose other than our player game jerseys, the University will be forced to take action."

In addition to the letters, there was the testimony of Gray describing how the jerseys come to be in the possession of Djaygee. It is best seen in an example: A sports team, for example, the Boston Celtics, enters into a contract with a vendor, for example, Nike. No doubt, in exchange for the commercial advantages of being the sponsor of the team (for example, the famous Nike swoosh being emblazoned on the team jersey broadcast to millions of potential customers), Nike provides the jerseys which will be customized by Djaygee with the appropriate player's name and number.[2] This Court hardly needs to see a cancelled check or written contract to draw the inference that the jerseys are the property of the team, regardless of who actually delivers the raw goods to Djaygee.

Based on those letters, as well as the testimony regarding the method in which the jerseys come to be in the possession of Djaygee, the only reasonable inference which can be drawn is that (1) the jerseys are the property of the teams (even though they may have been supplied by a vendor/sponsor such as Nike, Reebok, etc.); and (2) that the owners of these jerseys intended that Djaygee hold these jerseys to be used as needed. This need usually arises during the current season but that is not absolute. The fact that the teams did not check up on the status of their property at the end of various seasons does not change this conclusion. Nor does the fact that the parties to this litigation routinely dipped into that stock for their own personal gain alter this conclusion. It is true that the teams have shown limited, if any, interest in the overstock jerseys over the years and indeed, on those occasions when Djaygee gave

---

[2] Certainly these sponsorship/merchandising contracts are lengthy, complex and comprehensive and the supplying of a few hundred shirts is hardly a major component of the contract. It may even be that this is, in the grand scale of things, so minor as to not even warrant inclusion in what are no doubt multimillion dollars contracts. But whether it is a big team or smaller team, the point remains the same: Either the team itself or a vendor on behalf of the team, gives the "blank" jerseys to Djaygee to be customized when and as needed.

jerseys away to celebrities, this type of promotional activity may well have been at least implicitly approved by the teams. But this Court doubts that the Boston Celtics (or any other teams) would have approved of their property being used to pay Djaygee's accountant's bills, etc. The fact that the various teams trusted Djaygee to handle their property in a professional honest manner and did not check up on Djaygee does not constitute abandonment. This Court can and does draw the inference that at least as to those teams which have weighed in, the overstock jerseys are held in bailment and not subject to the Court's division order. The absence of a written contract or cancelled checks or receipts does not preclude this Court from relying on the testimony of the witnesses, including the plaintiff himself, and other exhibits to find that the jerseys are not the property of Djaygee but rather belong to the teams.

This Court is well aware that Tacason may well have only sent its inquiries out to the teams regarding the overstock jerseys after Judge Inge's order to, in a word, spite the plaintiff. However, the fact is that the inquiries were sent and a number of teams have responded, asserting their rights. This Court will not ignore this evidence. The only commonsense finding is the one made here: the jerseys belong to the teams and the longstanding practice was that the jerseys were held for years on end by Djaygee on behalf of the teams. Therefore, it is entirely reasonable for teams to assume that their property is being held by Djaygee until needed. But this is not just a matter of Tacason withholding bailed items.

The Court's October 9, 2009 order required equal division of the sports and music memorabilia as well as the jerseys. Tacason did not redivide any sports and music memorabilia after January 15, 2010. This Court questions Tacason's testimony to the effect that there is no such memorabilia (other than the few items described below which were damaged.)

While it is unclear what was not turned over per the Court's orders, what is clear is what was: a grouping of memorabilia which had been damaged or destroyed. Tacason vandalized certain property prior to turning it over to Gray: broken frames, slashed shirts, Gray's face

5

obliterated in keepsake photographs. This destruction of property which at the time was under the clear jurisdiction of this Court was intentional on Tacason's part, intended to interfere with and undermine this Court's orders.

The parties agree that Jeff Gardner did an inventory of jerseys on the business premises in the several weeks prior to Gray's departure. Tacason testified that she divided only those jerseys identified in Gardner's inventory when furnishing them to Gray. With full knowledge that there were many other boxes of inventory remaining (approximately 30), Tacason nonetheless instructed her employees to divide only those jerseys in the boxes included in Gardner's inventory. This withholding of property which at the time was under the clear jurisdiction of this Court was intentional on Tacason's part and intended to interfere with and undermine this Court's orders.

Similarly, in preparing for the Court-ordered division of property, Tacason did not instruct her employees to divide whatever jerseys and sports memorabilia existed in the warehouse which was adjacent to the main Djaygee work facility. To the contrary, her employees were for the most part, completely unaware of what property, if any, may have been present in the warehouse. Since Tacason delegated the execution of the Court's orders to her employees and did not instruct them to check in the warehouse which as a matter of simple logic would likely have contained a host of items, the only reasonable inference to be drawn is that this was done to circumvent this Court's orders. Only Tacason knows what was in that warehouse at the time she was instructing her employees to divide up the property. This Court finds that this omission by Tacason was intentional and intended to interfere with and undermine this Court's orders.

The above findings are supported, not only by the testimony of Djaygee's employees, such as Yebba, but also by the photographs introduced into evidence. Those photographs demonstrate that in multiple instances, Tacason had property which was subject to this Court's

6

orders but was nonetheless withheld. For example, despite the fact that photographs clearly show jerseys from the Dallas Mavericks and the Toronto Maple Leafs and San Antonio Spurs were present, Tacason failed to produce these jerseys or otherwise account for them. This Court rejects Tacason's testimony as not credible to the effect that boxes clearly labeled with the names of certains, e.g. "Spurs", were recycled and did not contain the goods as labeled. To the contrary, this Court finds that there were multiple instances where there was property which should and ought to have been divided which Tacason withheld.

Finally, there was the method of division itself. It was, simply put, not done consistent with the manner in which Judge Inge set forth. Instead, Tacason went ahead and boxed up those items which in her view were covered by Judge Inge's clear order. This was absolutely not what the order required and this Court draws the inference that Tacason knew it but implemented her own system to thwart the Court's order. By segregating, using her unilateral judgment, the items and then, putting Gray's emissary, Reading Fire Captain Marotta in an awkward position of having to take possession of these items, Tacason was again flouting this Court's orders. In defense of this method of division, Tacason has testified that "it never occurred to her" to do it any other way. This Court rejects the notion that Tacason was trying to comply with the letter or the spirit of the orders. To the contrary, this Court finds that this method of feigned compliance with the Court's orders was intentional and done to interefere with and undermine this Court's orders.

### 3. Rulings of Law

A party engages in contempt where he/she engages in undoubted disobedience of a clear and unequivocal Court Order. See Warren Gardens Hous. Coop. v. Clark, 420 Mass. 699, 700 (1995), quoting United Factory Outlet, Inc. v. Jay's Stores, Inc., 361 Mass. 35, 36 (1972); Nickerson v. Dowd, 342 Mass. 462, 464 (1961).

For all of the reasons set forth in the findings of fact, this Court finds the defendants in contempt of the Court's orders dated October 9 as well as the two dated January 15, 2010. This contempt occurred when Tacason: failed to divide all of the sports and music memorabilia, concealed some of it from the division process, asserted a bailment on behalf of numerous teams although she only had verification from a very small number of teams[3], destroyed or damaged property while subject to the jurisdiction of the Court, and failed to produce all of the non-bailment jerseys for division and failed to follow the process set forth by Judge Inge. In each instance, this Court finds that this was done intentionally, without justification and with the clear purpose of avoiding, circumventing and in fact defying the Orders of this Court.

The plaintiff has argued for the entry of a default judgment as the only appropriate sanction for Tacason's conduct. Tacason for her part, has attempted to explain her conduct and has suggested that the parties "try again" so to speak. Were this a minor misstep, or the first problem, the Court might agree. But it is not. Tacason has been given the benefit of the doubt on more than one occasion. But far from taking advantage of the opportunity to avoid a finding of contempt, Tacason has become emboldened and has totally ignored and in fact defied the repeated orders of this Court. The entry of a default judgment is appropriate where a party willfully fails and refuses to produce documents or other things as ordered by the Court "with no attempt to comply or showing of inability to comply." Gos v. Brownstein, 403 Mass. 252, 257 (1988); *accord*, Roxse Homes Ltd. P'ship v. Roxse Homes, Inc., 399 Mass 401, 405 (1987) (affirming default judgment as appropriate sanction for discovery violation). This Court is well aware that many of Tacason's actions may have been borne of her mistrust of, frustration at and anger toward Gray. This Court is further aware that some or all of these feelings may well be justified. However justified her feelings, Tacason does not have the luxury of repeatedly

---

[3] For all this Court knows, these other teams have in fact expressed their intent that they do not want the jerseys back or held. It has not gone unnoticed that the only documentation provided by Tacason has been by teams expressing the wish for return or continued bailment of the jerseys.

8

defying the orders of this Court. This Court is mindful that this sanction is a harsh one but in light of Tacason's conduct, no less sanction is appropriate.

Default judgment hereby enters against Tacason and Djaygee. Further, the counterclaims of Tacason and Djaygee are hereby dismissed. "[A] party who defies court orders, as these defendants have, is not in a position to seek remedies from the Court." Network Systems Architects, Co. v. Dimitruk, et al., Suffolk Sup. C.A. No. 06-4717BLS2, Slip Op. 12/4/07 (Fabricant, J.).

In addition to the above remedy, Gray also seeks attorneys fees. While it is true that Mass. R. Civ. P. 65 permits an award of an attorney's fees where a party fails to obey the order of the Court, given that the Court is not only entering a default judgment but dismissing defendants' counterclaims, this Court is of the view that given the harsh sanction imposed, it will not additionally order attorneys fees.

Two related issues remain to be addressed: First, subsequent to this Court's interim order, Gray filed a Request for further orders due to information developed at the time of the execution of the interim order. In essence, Gray alleges that at the time of executing the Order to hold the overstock jerseys in storage until further order of Court, evidence was developed which further proved that Tacason has withheld overstock jerseys. Given the relief ordered above, the Court will take no further action on this issue.

Second, there is the issue of what overstock jerseys are in fact held in bailment. This Court disagrees with Gray's position that since there is no documentation and/or since he and Tacason have for years used the overstocks for their own purposes, there is no bailment. A bailee of goods for use for an indefinite term has an obligation to confine its use of the goods to that contemplated fo the creation fo the bailment, to exercise care with respect to the goods and to return them to the bailor, or make them available for the bailor to pick up, at such time as the bailor should demand their return. *Woburn Country Club, Inc. v. Woburn Golf & Ski Auth.*, 1

9

Mass App. 259, 265-266(1985). In the absence of a specified term during which demand for return of the goods should be made, this Court will read the contract to imply "within a reasonable time." What is "reasonable" in turn must be determined in reference to the nature of the contract and the probable intention of the parties. *Warren v. Ball,* 341 Mass. 350 (1960). Here, based on the communications provided by at least some of the teams, it appears that while it does not happened frequently, teams do need to access their "old" jerseys now and again. It further appears that in the past Djaygee has always stored the overstock jerseys and never advised the teams that the jerseys would be considered overstock and abandoned after a period of time. That Gray and Tacason used what is now styled as an extremely valuable cache of collectibles as their own personal piggy bank does not make it right. As a matter of equity, this Court has been put on notice by a number of teams, including a number of major sports franchises, that 1. the jerseys are theirs and 2. they want them back. This Court will *not* disregard the clear unequivocal instructions of the bailor to the bailee regarding how the overstock jerseys should be handled. It is safe to say that although only a small number of teams have weighed in, others may well have the same position. This Court will not let Gray invoke the equitable power of this Court to transfer ownership of the property of innocent third parties whose only mistake has been to trust that the past and present owners of Djaygee would act professionally – and lawfully.

    Therefore, the Court orders as follows:

1. Default judgment is to enter for Gray as well as dismissal of Tacason's counterclaims.

2. Counsel shall confer and draft a communication for dissemination by Djaygee to all teams (except those which have already expressed their wishes). This communication to each bailor shall advise the team that it has these jerseys in its possession. This communication shall also

solicit instructions which shall include the following choices: does this bailor wish the return of some or all the goods, or continued storage of some or all of the goods for future use, or disposal of some or all of the goods within discretion of Djaygee. The communication shall make clear to the team number and age of the overstock jerseys (since some of the teams may not want all of the jerseys) A draft of this communication shall be produced at the next court date, August 9. If the parties are unable to agree on a communication, they may submit their respective version to the Court.

Further, An assessment of damages hearing on plaintiff's claims will be held in Courtroom 420 on August 9, 2010 at 10:00 a.m.

SO ORDERED:

_____
Justice of the Superior Court

Date: August 4, 2010