**2014 BNH 017**      Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                                      Bk. No. 12-11879-BAH
                                                                                            Chapter 7
Diane J. Tacason,
            Debtor

John Gray,
            Plaintiff

v.                                                                                          Adv. No. 12-1096-BAH

Diane J. Tacason &
Djaygee, Inc.,
            Defendants

*Patrick M. Groulx,*
*Donahue Grolman & Earle,*
*Boston, MA*
*Attorney for Plaintiff*

*Michael B. Feinman,*
*Feinman Law Offices,*
*Andover, MA*
*Attorney for Defendant,*
*Diane Tacason*

## MEMORANDUM OPINION

### I. INTRODUCTION

The Court has before it the cross-motions for summary judgment of the Plaintiff, John Gray and the Defendant, Diane Tacason.  Tacason seeks summary judgment on all remaining counts of the complaint, while Gray only asks for summary judgment on Count X.  For the reasons set forth below the Court shall grant Tacason summary judgment on Counts II, III, IV, and VIII, and shall grant Gray summary judgment on Count X.

1

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

The parties dispute many of the facts in this litigation, but not the facts that are relevant and material to the disposition of the cross-motions for summary judgment.  Tacason and Gray had a personal and business relationship which began in 1989.  The parties ran a business together, Djaygee Inc., which was operated under the name "Cutting Edge Sports."  Its main business was selling sports jerseys.  They each owned an equal share of the business entity. Tacason generally took care of the parties' books and records—both personal and business— while Gray designed the jerseys.  Both aspects of the parties' relationship completely disintegrated and resulted in litigation in Massachusetts state court in 2007 (the "2007 Litigation").  This litigation included claims (among others) that Tacason had breached her fiduciary duties to Gray as a fellow shareholder of a close corporation, wasted corporate assets, and committed fraud.  One of the key factual allegations in the 2007 Litigation was that "since at least 2003 Tacason has removed tens of thousands of dollars from the parties' bank accounts by way of Automatic Teller Machine bank withdrawals largely in $300, $400 and $500 denominations, and converted them to her own personal use to the exclusion of John Gray." Doc. No. 66, Ex. 1, Gray's Compl. in the 2007 Litigation.

The parties agreed to settle the 2007 Litigation six months after it began.  They executed a settlement agreement in March of 2008 (the "2008 Settlement").  Most importantly, the 2008 Settlement provided that "the parties agree to a general release as to all claims except those reserved by the settlement agreement and ongoing in NH."  Doc. No. 66, Ex. 3, ¶ 2.  In exchange

for the release Tacason agreed to pay Gray $50,000 and "equally divide the sports + music memorabilia and old team overstock jerseys at the Business Premises." Id. at ¶ 6.5.  The 2008 Settlement also provided for the dismissal of the 2007 Litigation with prejudice.  Id. at ¶ 8.

In 2009, Gray filed another lawsuit alleging that Tacason had breached the 2008 Settlement (the "2009 Litigation").  The 2009 Litigation came to its conclusion when the superior court found Tacason in contempt of court for failing to abide by three of its orders.  The court had issued these orders in furtherance of the division of property envisaged in the 2008 Settlement.  Doc. No. 60, Superior Court Order of August 4, 2010 (the "Contempt Order").  As a sanction, the court awarded default judgment to Gray and dismissed all of Tacason's counterclaims.  In finding contempt, the court stated that the contempt occurred

> when Tacason: failed to divide all of the sports and music memorabilia, concealed some of it from the division process, asserted a bailment on behalf of numerous teams although she only had verification from a very small number of teams, destroyed or damaged property while subject to the jurisdiction of the [c]ourt, and failed to produce all of the non-bailment jerseys for division and failed to follow the process set forth by Judge Inge.  In each instance, this [c]ourt finds that this was done intentionally, without justification and with the clear purpose of avoiding, circumventing and in fact defying the Orders of this [c]ourt.

Contempt Order, at 8 (footnote omitted).  The effect of the default judgment was to find Tacason liable for breach of the 2008 Settlement.

After entering default judgment for Gray, the superior court conducted a separate hearing to determine the extent of Gray's damages for Tacason's breach of the 2008 Settlement.  After the hearing, the court concluded that Tacason owed Gray $252,500, less Gray's share of certain storage costs.  Doc. No. 60, Superior Court Order dated April 6, 2011, at 6 (the "Damages Order").  These damages were Gray's damages under the 2008 Settlement; the court found that "Gray is entitled to recover for losses that would not have occurred had the contract been

3

performed." Damages Order, at 4.  The court found that these damages flowed from the value of the property that Tacason still owed Gray under the 2008 Settlement.  Id. at 1-4.

Tacason filed this bankruptcy petition on June 8, 2012.  At the 341 meetings that occurred on July 26, 2012 and May 9, 2013, Tacason testified that she transferred the assets of Djaygee, Inc. to herself in March 2012 for no consideration and with no bill of sale.  Doc. No. 81, Gray Supplemental Statement of Fact, at ¶¶ 17, 18.

This adversary proceeding was filed on September 20, 2012.  The complaint was amended once.  Doc. No. 43, First Amended Complaint (the "Amended Complaint").  After the hearing on the cross-motions for summary judgment, the Court issued an order dismissing all counts in the Amended Complaint, except Counts II, III, IV, VIII, and X, based on the agreement of the parties (Doc. No. 91) ("September 22, 2014 Order").  Of the remaining counts, Gray voluntarily dismissed all claims insofar as they were based on "ATM withdrawals" and "payroll checks."  Id.  Also in the September 22, 2014 Order, the Court indicated that it would consider the extent to which the remaining counts in the Amended Complaint were preempted by the pending chapter 7 bankruptcy case of Djaygee, Inc. in the District of Massachusetts, Bk. No. 13-11166-WCH.[1]  It gave the parties an opportunity to submit legal memoranda responding to this issue, as the Court had raised it sua sponte.

Of the Amended Complaint, five separate counts remain.  In Count II, Gray seeks to recover Tacason's alleged fraudulent conveyance of Djaygee's assets to herself on March 12, 2012, pursuant to state law—M.G.L. c. 109A.  In Counts III and IV, Gray seeks to liquidate damage claims against the estate based on Tacason's breach of fiduciary duty and fraud. Specifically, Counts III and IV allege that Tacason wrote checks on Djaygee's corporate account to cash, prior to 2007, without Gray's knowledge.  In Count VIII, Gray seeks to determine the

---

[1] Djaygee's chapter 7 case was filed after this adversary proceeding had already commenced.

debt liquidated in Counts III and IV to be nondischargeable under 11 U.S.C. § 523(a)(4) as a defalcation of a fiduciary duty.  In Count X, Gray asks the Court to determine the sanction awarded Gray by the Contempt Order to be nondischargeable pursuant to 11 U.S.C. § 523(a)(6) as damages Tacason inflicted in a willful and malicious injury.

### III. DISCUSSION

#### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence ha[ve] the potential to change the outcome of the suit.'"  Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)).  In assessing the summary judgment record, a court must draw all reasonable inferences in favor of the non-moving party but is "not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the court by a party." Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014) (citations omitted).  The non-moving party cannot simply rely on contestations of motive or intent, where those issues are contested merely by conclusory allegations, improbable inferences, and unsupported allegations.  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2007); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 424, 249-50 ("If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." (internal citations omitted)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

5

U.S. 574, 586 (1986) (parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

"[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson, 477 U.S. at 252.  Thus, Gray has the burden of proof to prove a debt's nondischargeability under section 523(a)(6) by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 283 (1991).  Additionally, "exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy, and, for that reason, the claimant must show that his claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (citation omitted).

    B.    The Claims in Counts III, IV, and VIII are barred by the Settlement Agreement

Tacason seeks summary judgment on Counts III and IV, arguing that they are either barred by either the 2008 Settlement or the applicable statute of limitations.  If they are so barred, then Count VIII necessarily fails.  The Court will first address whether the 2008 Settlement prevents Gray from asserting the claims in Counts III and IV.  Gray argues that the 2008 Settlement did not release unknown claims and that the fraud and breach of fiduciary duty claims were unknown at the time the parties entered into the 2008 Settlement.

"As a general matter, 'interpreting settlement agreements and their scope is a matter of state contract law.'" In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 15 (1st Cir. 2012) (quoting Fábrica de Muebles J.J. Álvarez, Inc. v. Inversiones Mendoza, Inc., 682 F.3d 26, 33 (1st Cir.2012)).  Although neither party addressed the issue, either in their briefs or at the hearing, the Court must address what law governs the interpretation of the 2008 Settlement. Both parties cited Massachusetts case law, but without further elaboration.  The 2008 Settlement

6

does not contain a choice-of-law clause.  The first step in this analysis is to determine what choice-of-law rule applies.  Smith v. Quizno's Master, LLC (In re Bouley), 503 B.R. 524, 530 (Bankr. D.N.H. 2013).  Bankruptcy courts are divided on whether to apply the choice-of-law rule of the forum state or the federal choice-of-law rules.  Id. at 530-31 (citing Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599 (2d Cir. 2001)).

Here, the Court does not need to decide between federal law or the forum state's law—the law of New Hampshire—because the law does not conflict.  In re Bouley, 503 B.R. at 531 (quoting Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004)).  New Hampshire applies the law with the most significant relationship to the 2008 Settlement.  Cecere v. Aetna Ins. Co., 145 N.H. 660, 662 (2001) ("It is well established that in the absence of an express choice of law validly made by the parties, the contract is to be governed, both as to validity and performance, by the law of the state with which the contract has its most significant relationship") (quotation omitted).  Federal law looks to the Restatement (Second) of Conflicts of Laws to determine choice-of-law issues.  Bouley, 503 B.R. at 531 (collecting cases).

Under the significant relationship test, "the rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."[2]  Restatement § 188(1).  Section 188(2) provides a number of factors to assist a court in

---

[2] Restatement § 6 provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>     (a) the needs of the interstate and international systems,
>     (b) the relevant policies of the forum,
>     (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>     (d) the protection of justified expectations,
>     (e) the basic policies underlying the particular field of law,
>     (f) certainty, predictability and uniformity of result, and
>     (g) ease in the determination and application of the law to be applied.

making this determination in cases where the parties have not made an effective choice as to what state's law governs the contract at issue:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Here, Massachusetts has the most significant relationship with the 2008 Settlement. The 2008 Settlement was agreed upon in Massachusetts to resolve litigation that was taking place in that state. Massachusetts is the state of incorporation of Djaygee, Inc. The two claims here at issue involve Tacason's disposition of corporate assets. The 2008 Settlement does mention some New Hampshire litigation, but only to clarify that the New Hampshire litigation would not be resolved by the settlement. Accordingly, the Court will apply Massachusetts law.

The first step in interpreting a contract is to determine whether the provisions are unambiguous. "If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment." Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002) (citation omitted). Only when a court determines a contract to be ambiguous does the intent of the parties become a question of fact. Id. Here, the Court finds the 2008 Settlement to be unambiguous. The 2008 Settlement on its face purports to be a "general release as to all claims except those reserved by the settlement agreement and ongoing in NH." Neither party has argued that the claims in Counts III and IV of the Amended Complaint were claims "reserved by the settlement agreement and ongoing in NH." In fact, those claims appear to be addressed in paragraph 1 of the 2008 Settlement, which provides "The New Hampshire property

(real and personal) is being adjudicated in NH.  This agreement will not effect [sic] any of the claims or issues pending in NH."

Under Massachusetts law, "[g]eneral releases dispose of all claims and demands arising out of any transactions between the parties." Leblanc v. Friedman, 438 Mass. 592, 598 (2003) (quotation omitted).  A general release "is to be given effect, even if the parties did not have in mind all the wrongs which existed at the time of the release." Schuster v. Baskin, 354 Mass. 137, 140 (1968) (quotation omitted).  "A release may be prompted by the settlement of a specific dispute or resolution of a specific issue, but broad wording in the release operates to settle all other, unrelated matters, even if they were not specifically in the parties' minds at the time the release was executed." Eck v. Godbout, 444 Mass. 724, 728 (2005).

Despite the 2008 Settlement containing a general release, Gray argues that the fraud and breach of fiduciary duty claims were unknown to him at the time of the settlement and so were not released by that settlement.  To support this argument, Gray cites the Massachusetts Supreme Judicial Court's decision in LaFleur v. C.C. Pierce, Co., Inc., 398 Mass. 254 (1986).  In LaFleur, a forklift blade fell on the plaintiff's foot.  At first only minor injuries were apparent.  The plaintiff settled the claim with the defendant to cover "all injuries" received from the accident and received a lump sum.  Eventually the plaintiff's condition worsened and both of his legs had to be amputated.  Id. at 256.  The plaintiff instituted litigation to rescind the settlement agreement based on mutual mistake.  The trial court granted summary judgment to the defendant based on the language of the settlement.  The Supreme Judicial Court reversed the decision.  Evidence was introduced on summary judgment that the forklift accident had exacerbated a pre-existing condition that caused the need for the amputations.  Neither the plaintiff nor the defendant had been aware of the pre-existing condition at the time of the settlement.  The LaFleur court adopted the unknown injury rule, a permutation of the doctrine of mutual mistake where "the intention of

9

the parties is controlling, and the relevant inquiry is whether there has been a conscious and deliberate intention by the parties to release claims for injuries existing but not known to them at the time of the agreement." Id. at 260. The LaFleur court specifically noted that in cases of mutual mistake, "[t]he mistake must be shared by both parties, and must relate to an essential element of the agreement." Id. at 258 (citations omitted).

The unknown injury rule does not apply to this case. This is not a situation of a mistake shared by both parties. A fact essential to Gray's claims is that while Tacason knew of the transfers she allegedly made out of Djaygee, Gray claims that he did not know about them. The 2008 Settlement is unambiguously a general release under Massachusetts law, and this Court concludes that it operates to release the fraud and breach of fiduciary duty claims contained in Counts IV and III of the Amended Complaint. These were claims in existence at the time the 2008 Settlement was executed and were released even if they were not in Gray's mind at that time. Eck v. Godbout, 444 Mass. at 728. Accordingly, the Court shall grant summary judgment to Tacason on Counts III and IV. Because the Court determines that the 2008 Settlement prevents Gray from asserting these claims, it need not address the statute of limitations arguments.

Without Counts III and IV, Count VIII is moot. It is a nondischargeability claim premised on damages that were to be liquidated in Counts III and IV. Without those counts, there is no debt for the Court to determine nondischargeable. The Court shall grant Tacason summary judgment on that count as well.

  C.  Count II is Property of the Djaygee, Inc. Bankruptcy Estate

At the Court's request, the parties briefed the issue on whether the currently pending bankruptcy case of Djaygee, Inc. in chapter 7 foreclosed Gray's state law fraudulent transfer claim in Count II. Generally, creditors lack standing to bring fraudulent transfer claims.

10

> Although courts may permit individual creditors to bring a fraudulent transfer action derivatively on behalf of the estate, creditors have no ability or standing to prosecute such an action in their own right and for their own benefit, even if they would have had standing to do so outside of bankruptcy. Any attempt by the creditor to pursue the action is barred by the automatic stay of section 362(a), either under the theory that the action is property of the estate, or constitutes a power and benefit vested initially and primarily in the estate representative.

Collier on Bankruptcy ¶ 548.02 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). "[C]reditors only have standing to pursue such claims during bankruptcy proceedings when a trustee or debtor in possession unjustifiably fails to pursue the claim." Morley v. Ontos, Inc. (In re Ontos, Inc.), 478 F.3d 427, 431 (1st Cir. 2007) (citation omitted).

Gray appears to have conceded this issue. In his supplemental brief, he cites case law mirroring that which the Court cited above. See Gray Supplemental Memorandum, at 4 (Doc. No. 95). In the same memorandum, Gray requested that the Court defer ruling on this issue until he could ask the chapter 7 trustee of Djaygee's estate to abandon the fraudulent transfer claims against Tacason. Gray later filed a notice indicating that he had changed his mind and would no longer attempt to request the Djaygee trustee to abandon the claims. See Notice of Intent not to File a Motion to Compel Abandonment (Doc. No. 100). Accordingly, the Court shall grant summary judgment to Tacason on Count II because Gray has no standing to bring this claim.

D. Count X under Section 523(a)(6): Issue Preclusion

In Count X, Gray seeks to except from discharge the contempt-sanction damages awarded to him for Tacason's failure to comply with the state court's orders. Gray and Tacason each seek summary judgment on this count. Gray believes he is entitled to summary judgment based on the principles of issue preclusion. Tacason argues that Gray is unable to establish a proper nexus between the alleged nondischargeable debt and the Damages Order.

Section 523(a)(6) provides that "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another

11

entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  The debt in question will be nondischargeable under this section when a creditor proves that (1) the debtor caused him or her injury, (2) the debtor's actions were willful, and (3) the debtor's actions were malicious. "Willfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question." Id. (quotations and citations omitted).  See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997); Ruma v. Kehaias (In re Kehaias), 2014 BNH 012.  An injury is caused maliciously when "it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will . . . .  The injury must have been committed in conscious disregard of one's duties." Levasseur v. Old Republic Nat'l Title Ins. Co. (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013) (quotations and citations omitted).

  The Court will first address whether the Contempt Order ought to be afforded preclusive effect in this proceeding.  "A debtor's failure or refusal to obey a court order, alone, is not necessarily determinative of a finding of willful and malicious injury under § 523(a)(6)." Field v. Hughes-Birch (In re Hughes-Birch), 499 B.R. 134, 150 (Bankr. D. Mass. 2013).  Federal courts look to the state law of the court that rendered the original decision to decide whether that decision is preclusive.  N.H. Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 328 (1st Cir. 1995); Langlois v. Mirulla (In re Mirulla), 163 B.R. 912, 916 (Bankr. D.N.H. 1994).

  The court that entered the Contempt Order was a Massachusetts court.  In Massachsuetts, "[t]he doctrine of issue preclusion provides that when an issue has been 'actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or different claim.'" Jarosz v. Palmer, 436 Mass. 526, 530-31 (2002) (quoting Cousineau v. Laramee, 388 Mass. 859, 863 n. 4 (1983)).

12

For an issue to be actually litigated and determined it must have been "'subject to an adversary presentation and consequent judgment' that was not 'a product of the parties' consent . . . .'" Jaroz, 436 Mass. at 531 (quoting Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 52 (1st Cir.1997)). Here, both the Contempt Order and the Damages Order were full evidentiary hearings with the opportunity for both sides to present their cases. The issues resolved in these orders were actually litigated and determined.[3]

Additionally, both the Contempt and Damages Orders were valid final judgments because "'the parties were fully heard, the judge's decision is supported by a reasoned opinion, and the earlier opinion was subject to review or was in fact reviewed.'" Jaroz, 436 Mass. at 533-34 (quoting Tausevich v. Board of Appeals of Stoughton, 402 Mass. 146, 148 (1988)).

From the Contempt Order it is clear that the state court made a finding that is preclusive on the willfulness element of section 523(a)(6). In the Contempt Order, the state court determined that Tacason intentionally caused the injury complained of—violation of its orders. While the Court did not specifically find that Tacason intended to injure Gray, injury to Gray was substantially certain to occur. Gray was the only party who stood to be harmed when Tacason failed to comply. The state court made specific factual findings that Tacason did damage or destroy of some Gray's property, in an intentional violation of its orders:

> Tacason vandalized certain property prior to turning it over to Gray: broken frames, slashed shirts, Gray's face obliterated in keepsake photographs. This destruction of property which at the time was under the clear jurisdiction of this [c]ourt was intentional on Tacason's part, intended to interfere with and undermine this [c]ourt's orders.

---

[3] Tacason argues that the Contempt Order is the subject of a pending appeal in Massachusetts and is thus incapable of being given preclusive effect. The record does not contain a copy of the appeal, and its status is unknown to the court. However, the Contempt Order itself is a final judgment. Under Massachusetts law (which controls here), a judgment is final for the purpose of issue preclusion, regardless of the fact that the judgment is the subject of a pending appeal. O'Brien v. Hanover Ins. Co., 427 Mass 194, 201 (1998) (applying the majority rule). To the extent that the appeal results in a reduction or elimination of the amount of Gray's claim against Tacason, Tacason may seek such relief from the judgment of nondischargeability arising in this proceeding as may be appropriate.

Contempt Order at 5-6.  Indeed by not complying, Tacason deprived Gray of the property the state court was attempting to divide between them.

The situation here is similar to that in Field v. Hughes-Birch, also a section 523(a)(6) claim in the context of a contempt sanction.  In that case, various state courts held the debtor in contempt.  Hughes-Birch, 499 B.R. at 134.  The debtor continuously ignored those courts' orders to vacate certain real property, which the debtor wrongly asserted belonged to her.  Id.  The state courts awarded damages to the actual owner of the real property, on which the debtor was trespassing.  These damages stemmed from a contempt sanction against the debtor.  When the debtor filed for bankruptcy, the property owner sought to except those damages from the discharge under section 523(a)(6).  The bankruptcy court found that the willfulness prong was satisfied because the debtor's trespass on the land was "intentional and continuous" and that "the [d]ebtor's intent to interfere with and deprive the [creditor] of its land . . . [was] manifestly clear from the findings of the" state court.  Id. at 152.

Here, Tacason's violation of the state court's orders was substantially certain "to interfere with and deprive" Gray of his right to the jerseys and other memorabilia that she refused to turn over.  Even though there is no explicit finding that Tacason intended to injure Gray, that his injury was substantially certain to occur from her actions is "manifestly clear" from the findings in the Contempt Order.

The Contempt Order is also preclusive on the maliciousness element.  The state court found that Tacason ignored its orders "intentionally, without justification . . . [w]ith no attempt to comply or showing of inability to comply."  Contempt Order at 8.  These determinations amount to a finding of maliciousness under section 523(a)(6), which requires a showing that Tacason knew the conduct was wrongful and had no justification for it.  The state court considered Tacason's attempts at justification, and nonetheless deemed her actions to be wrongful and in

14

conscious disregard of her duty.  See Contempt Order at 6 (finding that Tacason affirmatively refrained from instructing her employees to divide the contents of a warehouse in purposeful interference with its orders to the contrary, and discrediting her attempted justifications).

The determinations of willful and malicious injury, as described above, were essential to the ultimate judgment in the Contempt Order.  Both determinations were deemed "essential to the prior case by the court and the party to be bound [Tacason]."  Jaroz, 436 Mass. at 533 (quotation omitted).  The Court found Tacason's explanations as to her lack of compliance insufficient.  It is apparent from the Contempt Order that Tacason did attempt to justify her failure to comply in her own testimony.  The same is true of the findings that Tacason acted intentionally in violating the orders.  Indeed, the state court justified its ultimate decision—default judgment against Tacason as a sanction for her contempt—as appropriate because Tacason willfully violated its orders without any serious attempt to comply.  Contempt Order at 8.  Tacason argues that she did not receive a full and fair opportunity to litigate the issues of willfulness and maliciousness before the state court.  The essential nature of the determinations of willful and maliciousness to the Contempt Order show this to be an empty argument.  Those were precisely the issues the state court addressed at the evidentiary hearing.  Accordingly, the Court finds that the Contempt Order is preclusive on all the essential elements of section 523(a)(6).

Tacason argues that the Contempt Order does not establish the damage award as nondischargeable because the damages awarded Gray in the Damages Order were based on an obligation, namely the 2008 Settlement, that pre-existed the alleged injury; if the damages pre-existed the injury then the injury could not have caused the damages or given rise to the debt Gray wants determined nondischargeable.  Tacason misconstrues the nature of the Damage Order.  In the Contempt Order, the state court determined that the appropriate sanction would be

15

a default judgment in favor of Gray.  The Damages Order simply put a definite number on that sanction, which had already been imposed.  The sanction, which is the debt Gray seeks to hold nondischargeable, only came about because of Tacason's willful and malicious injury to Gray in violating the state court's orders.  Section 523(a)(6) excepts from discharge "any debt" for a willful and malicious injury.  Because the factual findings in the Contempt Order are preclusive on all essential elements of section 523(a)(6), the Court shall grant summary judgment to Gray on Count X.

**IV.  CONCLUSION**

For the reasons set forth above, the Court shall grant Tacason summary judgment on Counts II, III, IV, and VIII and grant summary judgment to Gray on Count X.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:  December 31, 2014            /s/ Bruce A. Harwood
                                    Bruce A. Harwood
                                    Chief Bankruptcy Judge