**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

_____

**BAP NO. NH 15-003**

_____

**Bankruptcy Case No. 12-11879-BAH**
**Adversary Proceeding No. 12-01096-BAH**

_____

**DIANE J. TACASON,**
**d/b/a Cutting Edge Sports,**
**Debtor.**

_____

**JOHN GRAY,**
**Plaintiff-Appellee,**

**v.**

**DIANE J. TACASON,**
**Defendant-Appellant.**

_____

**Appeal from the United States Bankruptcy Court**
**for the District of New Hampshire**
**(Hon. Bruce A. Harwood, U.S. Bankruptcy Judge)**

_____

**Before**
**Feeney, Hoffman, and Finkle,**
**United States Bankruptcy Appellate Panel Judges.**

_____

**Michael B. Feinman, Esq., and Stephen P. Shannon, Esq.,**
**on brief for Defendant-Appellant.**

**Carlo Cellai, Esq., on brief for Plaintiff-Appellee.**

_____

**September 25, 2015**

_____

**Hoffman, U.S. Bankruptcy Appellate Panel Judge.**

The debtor, Diane J. Tacason, appeals the bankruptcy court's judgment in favor of John Gray as to the nondischargeability pursuant to Bankruptcy Code § 523(a)(6)[1] of a certain debt owed by Ms. Tacason to Mr. Gray. The bankruptcy court entered judgment after a hearing on the parties' cross-motions for summary judgment. Summary judgment in favor of Mr. Gray was premised on the issue-preclusive effect of a pre-bankruptcy state court contempt judgment against Ms. Tacason. For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

### I.       Pre-Bankruptcy Events

Ms. Tacason and Mr. Gray had a personal and business relationship which began in 1989. They owned (50% each) all of the stock of a company, Djaygee, Inc., and under the trade name "Cutting Edge Sports" operated its business of selling sports jerseys. Ms. Tacason generally oversaw the books and records—both of the company and of the couple personally—while Mr. Gray designed the company's jerseys.

In 2007, after the couple's personal and business relationship had disintegrated, Mr. Gray sued Ms. Tacason in Massachusetts state court (the "2007 Litigation") alleging, among other

_____

[1]  Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq.

2

things, that Ms. Tacason had breached her fiduciary duties to Mr. Gray as a fellow shareholder of a close corporation, wasted corporate assets, and committed fraud.   Ms. Tacason denied all of Mr. Gray's allegations.

In March 2008, the parties executed a settlement agreement ending the 2007 Litigation (the "Settlement Agreement").   Under the Settlement Agreement, Ms. Tacason agreed to pay Mr. Gray $50,000.00 for his 50% ownership interest in Djaygee, Inc. and to assume the company's ordinary course of business debt, and the parties agreed they would "equally divide the sports and music memorabilia and old team overstock jerseys at the business premises." The Settlement Agreement also provided that "[t]he parties agree to a general release as to all claims except those reserved by the settlement agreement and ongoing in NH", and to dismiss the 2007 Litigation with prejudice.

In 2009, Mr. Gray commenced a Massachusetts state court action against Ms. Tacason and Djaygee, Inc. (the "2009 Litigation"), alleging that Ms. Tacason had breached the Settlement Agreement due to her failure to pay the full $50,000.00, assume the business debt, and divide the personal property.   Ms. Tacason and Djaygee, Inc. denied the allegations and asserted counterclaims against Mr. Gray.

During the 2009 Litigation, the state court issued several orders to facilitate the division of property contemplated by the Settlement Agreement.[2]   In June 2010, Mr. Gray sought to have Ms. Tacason and Djaygee, Inc. held in contempt for failing to comply with these orders.   On July 7 and 8, 2010, the state court held an evidentiary hearing on Mr. Gray's request for contempt.   Both individuals were present at the hearing accompanied by counsel.   On August 4, 2010, the state court entered an order finding Ms. Tacason and Djaygee, Inc. in contempt of court (the "Contempt Order").[3]   In the Contempt Order, the state court made specific findings, including the following:

1.   "Tacason did not comply with this Court's orders and in fact engaged in numerous tactics to stall, interfere with, prevent and ultimately thwart this Court's orders."

2.   "Tacason vandalized certain property prior to turning it over to Gray: broken frames, slashed shirts, Gray's face obliterated in keepsake photographs.   This destruction of property which at the time was under the clear jurisdiction of this Court was intentional on Tacason's part, intended to interfere with and undermine this Court's orders."

3.   "With full knowledge that there were many other boxes of inventory remaining (approximately 30), Tacason nonetheless instructed her employees to divide only those jerseys included in Gardner's inventory.   This withholding of property which at the time was under the clear jurisdiction of this Court was intentional on Tacason's part and intended to interfere with and undermine this Court's orders."

---

[2]   For example, an order dated October 9, 2009, required Ms. Tacason and Mr. Gray to transport all sports and music memorabilia and all hockey and basketball jerseys in their possession to a location convenient to both parties, and to equally divide them by selecting, one by one, items of their choosing until all items were divided.   The state court apparently issued additional orders regarding the division of property, although it is unclear from the record exactly what those orders required.

[3]   The Contempt Order stated: "For the sake of simplicity, this Court will refer to the two defendants as 'Tacason' inasmuch as there is no dispute that she is the principal and was the person in charge of executing the Court's orders on behalf of Djaygee."

4.  "Since Tacason delegated the execution of the Court's orders to her employees and did not instruct them to check in the warehouse which as a matter of simple logic would likely have contained a host of items, the only reasonable inference to be drawn is that this was done to circumvent this Court's orders.   Only Tacason kn[ew] what was in that warehouse at the time she was instructing her employees to divide up the property.   This Court finds that this omission by Tacason was intentional and intended to interfere with and undermine this Court's orders."

5.  "[T]his Court finds that there were multiple instances where there was property which should and ought to have been divided which Tacason withheld."

6.  "[The division itself] was . . . not done consistent with the manner in which [the state court] set forth.   Instead, Tacason went ahead and boxed up those items which in her view were covered by [the state court]'s clear order.   This was absolutely not what the order required and this Court draws the inference that Tacason knew it but implemented her own system to thwart the Court's order.   By segregating, using her unilateral judgment, the items and then, putting Gray's emissary, Reading Fire Captain Marotta in an awkward position of having to take possession of these items, Tacason was again flouting this Court's orders. . . . This Court rejects the notion that Tacason was trying to comply with the letter or the spirit of the orders.   To the contrary, this Court finds that this method of feigned compliance with the Court's orders was intentional and done to interfere with and undermine this Court's orders."

Noting that a party engages in contempt when she engages in "undoubted disobedience of a clear and unequivocal order," the state court found as follows:

For all of the reasons set forth in the findings of fact, this Court finds the defendants in contempt of the Court's orders dated October 9 as well as the two dated January 15, 2010.   This contempt occurred when Tacason: failed to divide all of the sports and music memorabilia, concealed some of it from the division process, asserted a bailment on behalf of numerous teams although she only had verification from a very small number of teams, destroyed or damaged property while subject to the jurisdiction of the Court, and failed to produce all of the non-bailment jerseys for division and failed to follow the process set forth by [the state court].   In each instance, this Court finds that this was done intentionally, without justification and with the clear purpose of avoiding, circumventing and in fact defying the Orders of this Court.

5

The court then stated:

> Tacason for her part, has attempted to explain her conduct and has suggested that the parties "try again" so to speak. Were this a minor misstep, or the first problem, the Court might agree. But it is not. Tacason has been given the benefit of the doubt on more than one occasion. But far from taking advantage of the opportunity to avoid a finding of contempt, Tacason has become emboldened and has totally ignored and in fact defied the repeated orders of this Court.

(footnote omitted).

The state court noted that although "many of Tacason's actions may have been borne of her mistrust of, frustration at and anger towards Mr. Gray," she did not have "the luxury of repeatedly defying the orders of th[e] Court." As a sanction for her contempt, the state court entered a default judgment against Ms. Tacason, and dismissed all of her counterclaims in the 2009 Litigation. It also scheduled an "assessment of damages hearing on plaintiff's claims . . . ."

Thereafter, the state court conducted a separate evidentiary hearing to assess damages against Ms. Tacason. In an order dated April 6, 2011 (the "Damages Order"), the court determined that Mr. Gray was entitled to damages in the amount of $252,500.00, less Mr. Gray's share of certain storage costs.[4] In assessing damages, the court noted that the purpose of awarding damages is "to place the plaintiff in the same position as if no wrong had been done to him," and that it was "clear that had Tacason abided by the terms of the settlement agreement,

---

[4] The Order provided, in relevant part, as follows: "It is Ordered that judgment shall enter for the Plaintiff in the amount of $252,500.00 (less a set off for Gray's share of storage charges at Father & Son Storage) on Count I of plaintiff's complaint. The remaining counts are dismissed."

6

Gray would have had a substantial collection of valuable sports and music memorabilia [ ] as

well as overstock jerseys." The state court's damage award in the amount of $252,500.00 was

based on Mr. Gray's share of the value of the property and the remaining payment due under the

terms of the Settlement Agreement.[5] The state court also appointed a receiver, finding that Ms.

Tacason had "consistently acted in direct contravention of this Court's orders with the result

being that the Court's orders [were] repeatedly ignored and indeed thwarted" and that she had

"concealed property while it was under the jurisdiction of th[e] Court." The state court

concluded that "without the appointment of a receiver, there [wa]s a very high likelihood of

transfer or alienation of property which might otherwise be used to secure this judgment."

     On November 1, 2012, the state court entered an Amended Final Judgment

("Massachusetts Judgment") as follows:

> This action came on before the Court, Bruce R. Henry, Justice, presiding, and
> upon Plaintiff's Motion for entry of separate and final Judgment pursuant to
> Mass. R. Civ. P. 54(b), no opposition having been filed, and the Court having
> found and determined that there is no just reason for delay in the entry of final
> Judgment and therefore allowed said motion, and upon consideration thereof,
>
> It is ORDERED and ADJUDGED:
>
> That the plaintiff, John Gray, recover of the defendants Diane Tacason and
> DJaygee, Inc., jointly and severally, the sum of $252,500.00 with interest from

---

[5] The court calculated this amount as follows: $12,500.00 representing the remaining balance due Mr.
Gray from the $50,000.00 obligation; $40,000.00 representing a 50% share of the value of the sports and
music memorabilia; and $200,000.00 representing a 50% share of the value of the sports jerseys. In
determining the amount of damages, the state court found that the values of certain items were impacted
by the fact that Ms. Tacason had vandalized some of the memorabilia and jerseys.

03/20/2008 to 10/30/2012 in the amount of $139,879.31 and its costs of action, as provided by law.[6]

## II.     The Bankruptcy Case

On June 8, 2012, Ms. Tacason filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code.   In schedule F of the schedules of assets and liabilities filed in support of her petition, she listed Mr. Gray as an unsecured creditor with a disputed claim in the amount of $252,000.00.

On September 20, 2012, Mr. Gray filed in the bankruptcy court a complaint, and subsequently an amended complaint, against Ms. Tacason and Djaygee, Inc.   His amended complaint contained eleven counts, but the only count relevant to this appeal is Count X, in which Mr. Gray sought pursuant to Bankruptcy Code § 523(a)(6) to except from Ms. Tacason's discharge the debt arising from the Massachusetts Judgment.   Ms. Tacason filed a timely answer with affirmative defenses.

Thereafter, Mr. Gray filed a motion for summary judgment as to Count X.[7]   Mr. Gray asserted that the state court's findings in the contempt proceedings conclusively established Mr. Gray suffered an injury as a result of Ms. Tacason's willful and malicious conduct, and Ms.

---

[6]   The state court made no mention of the offset for Mr. Gray's share of the storage costs as set forth in the Damages Order.   Ms. Tacason appealed, although there is nothing in the record regarding the status of that appeal and its status was unknown to the bankruptcy court at the time of its decision.

[7]   On December 31, 2013, between the time Mr. Gray had commenced the adversary proceeding and the filing of his summary judgment motion, Ms. Tacason's case was converted from chapter 13 to chapter 7. As discussed in footnote 8, the conversion to chapter 7 is significant as § 523(a)(6) is not applicable in chapter 13 cases.   See Auto. Fin. Corp. v. Morse (In re Morse), BAP No. MB 12-081, 2013 WL 5290013, at *1 (B.A.P. 1st Cir. Sept. 11, 2013) (citing Bankruptcy Code § 1328(a)(2)).

Tacason's actions were intentional and without justification, and, therefore, Ms. Tacason was precluded from relitigating those issues. Mr. Gray claimed the state court's findings must be given preclusive effect, and that he was entitled to judgment as a matter of law.

Ms. Tacason filed an opposition to Mr. Gray's motion in which she requested summary judgment in her favor with respect to Count X. She also filed a separate motion for summary judgment as to the other counts of the amended complaint. With respect to Count X, Ms. Tacason argued summary judgment should be entered in her favor as Mr. Gray could not prove all of the elements of § 523(a)(6). According to Ms. Tacason, collateral estoppel did not apply as the state court's contempt finding was based on her violation of court orders while the damage award to Mr. Gray was the result of a default judgment. She argued, therefore, that the issue of her willful and malicious conduct was never actually litigated in the state court. Moreover, she asserted, Mr. Gray was unable to establish a proper nexus between the assessed damages and her contemptuous actions. According to Ms. Tacason, rather than a sanctions assessment relating to her contemptuous conduct, the state court's damage assessment was simply a determination of the value of the property that was to be divided and how much of that value was to be apportioned to Mr. Gray.

After a hearing on the cross-motions for summary judgment, and based on the agreement of the parties and the voluntary dismissal of certain claims by Mr. Gray, the bankruptcy court entered an order (the "September 22, 2014 Order") dismissing all counts of the amended complaint, except Counts II, III, IV, VIII, and X. The bankruptcy court also directed the parties to submit supplemental briefs on certain issues. Mr. Gray was directed to address the following

issue: "Whether and to what extent the Defendant's contempt of court, as determined in the Massachusetts Superior Court's Order of August 4, 2010, may have caused damage to the Plaintiff (or to the Plaintiff's property) that constitutes the debt that the Plaintiff seeks to except from discharge."

In his supplemental brief, Mr. Gray argued:

Simply put, the obligations in the superior court's orders mirrored her pre-existing obligations under the parties' March 24, 2007, settlement agreement ("the Settlement Agreement"). In willfully and maliciously violating the superior court's orders, she willfully and maliciously breached the Settlement Agreement. The judgment arising out of those breaches ($40,000 for sports and music memorabilia and $200,000 for overstock jerseys plus statutory interest) is therefore nondischargeable. . . .

Under the Settlement Agreement, "[t]he parties shall equally divide the sports + music memorabilia and old team overstock jerseys at the Business Premises." [Document 75], p. 4, ¶ 6.5. When Tacason failed to do so, the superior court entered a preliminary injunction requiring Tacason to "equally divide" "all sports and music memorabilia and all hockey and basketball jerseys…." [Document 64-2], p. 10. Tacason was therefore under both a court order and a contractual obligation to split equally the memorabilia and overstock jerseys with Gray. But as the superior court found, she actively attempted to circumvent her obligations—obligations arising both under the Settlement Agreement and the superior court's orders. . . .

According to Mr. Gray, the Massachusetts superior court found Ms. Tacason's failure to split the memorabilia and overstock jerseys to be a willful and malicious violation of its orders, and, therefore, her failure to do so was "necessarily also a willful and malicious breach" of the Settlement Agreement. Mr. Gray argued, therefore, that his damages arose directly out of Ms. Tacason's willful and malicious breach of the Settlement Agreement, and were nondischargeable.

10

On December 31, 2014, the bankruptcy court entered judgment in favor of Mr. Gray on Count X of his amended complaint.   In addition, the court entered judgment in favor of Ms. Tacason on Counts II, III, and IV, and VIII.   In its memorandum opinion, the court determined that the Contempt Order had preclusive effect because the state court found that Ms. Tacason willfully and maliciously injured Mr. Gray when she failed to comply with the court's orders requiring her to turn over certain property to Mr. Gray pursuant to the Settlement Agreement.

Ms. Tacason has appealed the judgment on Count X to this Panel.

## JURISDICTION

The Panel has jurisdiction to hear appeals from a final judgment of the bankruptcy court. 28 U.S.C. § 158(a)(1).   An order granting summary judgment is a final order where no counts against any defendants remain.   Frykberg v. JPMorgan Chase Bank (In re Frykberg), 490 B.R. 652, 656 (B.A.P. 1st Cir. 2013).   The bankruptcy court's order is final because it disposed of all remaining counts of the amended complaint.   Thus, the Panel has jurisdiction.

## STANDARD OF REVIEW

The Panel reviews a bankruptcy court's grant of summary judgment de novo.   See Scotiabank de P.R. v. Burgos (In re Plaza Resort at Palmas, Inc.), 741 F.3d 269, 274 (1st Cir. 2014); Harrington v. Simmons (In re Simmons), 525 B.R. 543, 547 (B.A.P. 1st Cir. 2015) (citing Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015); Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 270 (1st Cir. 2014)); see also Blacksmith Invs., Inc. v. Woodford (In re Woodford), 418 B.R. 644, 650 (B.A.P. 1st Cir. 2009) (applying de novo review to application of collateral estoppel).

11

## DISCUSSION

**I.    Applicable Law**

**A.    The Summary Judgment Standard**

The Panel has described the summary judgment standard as follows:

"In bankruptcy, summary judgment is governed in the first instance by Bankruptcy Rule 7056."  <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760, 762 (1st Cir. 1994).   "By its express terms, the rule incorporates into bankruptcy practice the standards of Rule 56 of the Federal Rules of Civil Procedure."  <u>Id.</u>; <u>see also</u> Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56.   "It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law."  <u>In re Varrasso</u>, 37 F.3d at 763 [citation omitted].   The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

<u>Weiss v. Wells Fargo Bank, N.A. (In re Kelley)</u>, 498 B.R. 392, 397 (B.A.P. 1st Cir. 2013)

(footnote omitted).

**B.    Nondischargeability Under § 523(a)(6)**

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C. § 523(a)(6).[8]   To

---

[8]   It is important to note that a debt falling within the scope of § 523(a)(6) which may be nondischargeable in a chapter 7 case may nevertheless be discharged in a chapter 13 case.   <u>See</u> <u>In re Morse</u>, 2013 WL 5290013, at *1.   This is because the chapter 13 discharge provision provides its own list of exceptions to discharge, and the § 523(a)(6) exception for a willful and malicious injury to property is not among them.   <u>See</u> 11 U.S.C. § 1328(a).   Thus, in chapter 13, when a debtor completes all payments under the plan, a debt that would be nondischargeable under § 523(a)(6) is nevertheless discharged.   Consequently, at the time Mr. Gray filed his complaint, he did not have a cause of action under § 523(a)(6) because the case was a chapter 13 case.   We do not see this as disabling, however,

12

except a debt from discharge under § 523(a)(6), a creditor must show: (1) the debtor injured him or his property; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. Jones v. Svreck (In re Jones), 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003). The creditor bears the burden of proving his claim under § 523(a)(6) by a preponderance of the evidence, Liddell v. Peckham (In re Peckham), 442 B.R. 62, 77 (Bankr. D. Mass. 2010) (citing Grogan v. Garner, 498 U.S. 279, 287 (1991)), but to obtain summary judgment, the record must compel a determination of nondischargeability as a matter of law.

Although the term "injury" is not defined by the Bankruptcy Code, it is understood to mean a "violation of another's legal right, for which the law provides a remedy." First Weber Grp., Inc. v. Horsfall, 738 F.3d 767, 774 (7th Cir. 2013) (citation omitted) (internal quotations omitted). "Willfulness" requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question. See Kawaauhau v. Geiger, 523 U.S. 57 (1998); see also Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013) (citations omitted). "An injury is malicious 'if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.'" In re Levasseur, 737 F.3d at 818 (quoting Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997)). The injury must have been committed in "conscious disregard of one's duties." Id. (citations omitted)). Stitching these definitional threads together leads to a

---

because by the time Mr. Gray sought summary judgment and the bankruptcy court rendered its decision, the case was in chapter 7 and the § 523(a)(6) exception to discharge applied. In any event, the issue was never raised below or before the Panel.

four-part test for determining nondischargeability under § 523(a)(6): (1) the creditor suffered an injury; (2) the injury was the result of the debtor's actions; (3) the debtor intended to cause the injury or there was a substantial certainty the injury would result from the debtor's act; and (4) the debtor had no just cause or excuse for the action resulting in injury.  Hermosilla v. Hermosilla (In re Hermosilla), 430 B.R. 13, 22 (Bankr. D. Mass. 2010) (citations omitted); Bauer v. Colokathis, 417 B.R. 150, 157-58 (Bankr. D. Mass. 2009).

### C.    Issue Preclusion

The doctrine of issue preclusion, also referred to as collateral estoppel,[9] bars the relitigation of issues determined in prior court actions.  See Field v. Hughes-Birch (In re Hughes-Birch), 499 B.R. 134, 150-51 (Bankr. D. Mass. 2013) (citing Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991)).  If the party against whom the doctrine of issue preclusion is sought "had a full and fair opportunity to litigate certain issues, whether they are factual or legal, that party cannot re-litigate those issues in a subsequent suit."  Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012).  Issue preclusion "can apply [even] where the subsequent proceeding involves a cause of action different from the first."  Id. (citation omitted).  The doctrine of issue preclusion applies in bankruptcy dischargeability proceedings.  In re Hughes-Birch, 499 B.R. at 148.  "[W]here there has been a prior state court judgment, the bankruptcy court's ultimate

---

[9]  The term "issue preclusion" encompasses the doctrine of collateral estoppel.  Bobby v. Bies, 556 U.S. 825, 830 n.1 (2009).  "Currently, the more descriptive term 'issue preclusion' is often used in lieu of 'collateral estoppel.'"  Yeager v. United States, 557 U.S. 110, 120 n.4 (2009).  As such, we will use the term "issue preclusion" here.

dischargeability determination will be governed by any factual issues that were actually and necessarily decided by the state court." B.B. v. Bradley (In re Bradley), 466 B.R. 582, 586 (B.A.P. 1st Cir. 2012) (citation omitted) (internal quotations omitted).

Federal courts look to the state law of the court that rendered the original decision to decide whether that decision is preclusive. N.H. Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 328 (1st Cir. 1995) (citation omitted); Langlois v. Mirulla (In re Mirulla), 163 B.R. 912, 916 (Bankr. D.N.H. 1994) (citation omitted). In this case, a Massachusetts court entered the relevant orders, so Massachusetts law is applicable.

The Supreme Judicial Court of Massachusetts has stated that issue preclusion applies when:

> "(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication. Additionally the issue decided in the prior adjudication must have been essential to the earlier judgment."

Pisnoy v. Ahmed (In re Sonus Networks, Inc.), 499 F.3d 47, 57 (1st Cir. 2007) (quoting Kobrin v. Bd. of Registration in Med., 832 N.E.2d 628, 634 (Mass. 2005)). "Massachusetts courts also require that appellate review must have been available in the earlier case before issue preclusion will arise." Id. (citing Sena v. Commonwealth, 629 N.E.2d 986, 992 (Mass. 1994)).

Thus, when an issue has been "'actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or different claim.'" Jarosz v. Palmer, 766 N.E.2d 482, 487-88 (Mass. 2002) (quoting Cousineau v. Laramee, 448 N.E.2d 756,

758 n.4 (Mass. 1983)).   For an issue to be actually litigated and determined it must have been

"'subject to an adversary presentation and consequent judgment' that was not 'a product of the

parties' consent . . . .'"   Id. at 488 (quoting Keystone Shipping Co. v. New Eng. Power Co., 109

F.3d 46, 52 (1st Cir. 1997)).

## II.    Analysis

Ms. Tacason argues that the bankruptcy court erred in determining that the state court's

findings in the contempt proceedings had preclusive effect in the subsequent nondischargeability

proceeding under § 523(a)(6) for the following reasons: (1) the relevant issues were not actually

litigated in the state court due to the entry of a default judgment; (2) the state court's rulings did

not establish the necessary elements of § 523(a)(6); and (3) there was no causal connection

between Ms. Tacason's alleged willful and malicious conduct (as established by the Contempt

Order), and the state court's subsequent award of damages based on a breach of contract analysis

(as set forth in the Damages Order).

### A.    Were the Issues Actually Litigated?

Ms. Tacason argues that the bankruptcy court erred in applying the doctrine of issue

preclusion because the Massachusetts Judgment arose not from a determination on the merits of

the underlying complaint but from the entry of a default judgment and, therefore, the issue of her

willful and malicious conduct was never actually litigated in the state court.

Courts generally do not apply issue preclusion if the issue sought to be precluded was not

actually litigated in the prior proceeding.   See Backlund v. Stanley Snow (In re Stanley-Snow),

405 B.R. 11, 19 (B.A.P. 1st Cir. 2009).   Default judgments, therefore, generally do not have

preclusive effect because the issues are not actually litigated on the merits.   See id.; see also D'Amour v. Birchall (In re Birchall), 501 B.R. 142, 149 (Bankr. D. Mass. 2013) (citing Treglia v. MacDonald, 717 N.E.2d 249 (Mass. 1999)).   Nevertheless, courts have recognized an exception to this rule when the party against whom the default judgment entered has actively or substantially participated in the action.   See In re Stanley-Snow, 405 B.R. at 19; In re Birchall, 501 B.R. at 149 (citations omitted); see also Acevedo v. Wells Fargo Bank, N.A. (In re Acevedo), A.P. No. 11-04129, 2015 WL 1876857, at *3 (Bankr. D. Mass. Apr. 21, 2015) (citing cases).   In addition, issue preclusion may apply when the defendant participates in the lawsuit but deliberately prevents resolution of it and a default judgment is entered against it as a sanction for refusing to comply with valid court orders.   See In re Acevedo, 2015 WL 1876857, at *3 (citing O'Neal Steel, Inc. v. Chatkin (In re Chatkin), 465 B.R. 54, 65 (Bankr. W.D. Pa. 2012)). "Courts thus have applied [issue preclusion] when the party opposing such application participated in the prior proceeding for many months, engaged in discovery, filed various pleadings or was sanctioned for conduct in a way that disposed of the initial proceeding."   Id. (citing cases).

The record on appeal reflects that Ms. Tacason actively participated in the 2009 Litigation, filing numerous pleadings and motions during that time.   Moreover, the state court entered the default judgment in the 2009 Litigation as a sanction for her contemptuous conduct in refusing to comply with its orders.   Accordingly, this was not a typical default judgment scenario where a defendant by neglect or by choice failed to participate in the case.   The contempt proceedings were separate and distinct from the original case.   The state court issued

both the Contempt Order and the Damages Order after full evidentiary hearings with the opportunity for both sides, who were present in person or through counsel, to present their cases, and the decisions were supported by reasoned opinions that were subject to appellate review. Thus, the entry of a default judgment in the 2009 Litigation does not disqualify the state court's findings from application of the issue preclusion doctrine in this case.

**B.      Did the State Court Determine Willful and Malicious Injury?**

In order for the doctrine of issue preclusion to compel entry of summary judgment in Mr. Gray's favor under § 523(a)(6), it was necessary for Mr. Gray to demonstrate the state court actually determined: (1) that Mr. Gray was injured, (2) as a result of Ms. Tacason's actions, (3) that Ms. Tacason intended to cause or was substantially certain her acts would cause the injury, and (4) that Ms. Tacason had no just cause for her actions.    See In re Bradley, 466 B.R. at 588. Ms. Tacason argues that the state court's findings in the contempt proceeding did not satisfy these requirements.

To hold a party in contempt, "there must be a clear and unequivocal [order] and an equally clear and undoubted disobedience."   Parker v. Commonwealth, 863 N.E.2d 40 (Mass. 2007) (citing Nickerson v. Dowd, 174 N.E.2d 346 (Mass. 1961)).   Courts have often held that a violation of a court order resulting in an order of contempt satisfies the willful and malicious requirements of § 523(a)(6).   See, e.g., Musilli v. Droomers (In re Musilli), 379 F. App'x 494, 499 (6th Cir. 2010); Siemer v. Nangle (In re Nangle), 274 F.3d 481, 484 (8th Cir. 2001) (finding debtor's conduct in disobeying court order willful and malicious because it targeted creditor and was almost certain to cause harm); Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re

18

Williams), 337 F.3d 504, 511-13 (5th Cir. 2003) (holding contempt judgment resulting from

debtor's violation of agreed judgment nondischargeable under § 523(a)(6) because judgment had

"made him substantially certain that his acts would inflict injury" should he not comply with its

directives); Dentrust Dental Int'l v. Rosenberg (In re Rosenberg), AP No. 05-1587, 2007 WL

2156282 (Bankr. N.D. Ohio July 23, 2007) (determining collateral estoppel prevented debtor

from relitigating contempt order with respect to willful and malicious injury caused by violation

of non-compete agreement); Heyne v. Heyne, (In re Heyne), 277 B.R. 364, 369 (Bankr. N.D.

Ohio 2002) ("[A] finding of contempt—which at the very least requires that the alleged

[contemnor] must have knowingly disobeyed the underlying order—clearly lends itself to a

finding of a deliberate and intentional act."); see also Davis v. Cox, 356 F.3d 76, 97 n. 21 (1st

Cir. 2004) (noting creditor could pursue a nondischargeability ruling under § 523(a)(6) based

upon debtor's prior violations of divorce court injunction).   Some courts have held that the

failure to comply with a court order constitutes willful and malicious conduct as a matter of law.

See, e.g., Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn), 242 B.R. 229 (Bankr.

W.D.N.Y. 1999); PRP Wine Int'l, Inc. v. Allison (In re Allison), 176 B.R. 60 (Bankr. S.D. Fla.

1994).   Other courts have concluded § 523(a)(6) does not make a contempt sanction

nondischargeable per se, but rather requires a determination that the conduct leading to the

sanction was willful and malicious.   See In re Hughes-Birch, 499 B.R. at 150; In re Peckham,

442 B.R. at 80 (citation omitted).   "Whether contempt sanctions are nondischargeable . . .

depends not on whether they are labeled as 'contempt,' but on whether the conduct leading to

them was 'willful and malicious.'"   In re Peckham, 442 B.R. at 80 (citation omitted).

In its Contempt Order, the state court made specific findings of fact setting forth the nature and extent of Ms. Tacason's contemptuous conduct in violating the court's orders and depriving Mr. Gray of the property to which he was entitled. These findings established Ms. Tacason's willful and malicious conduct and have preclusive effect regarding the nondischargeability of the debt arising from the Massachusetts Judgment under § 523(a)(6). As to the willfulness element, the state court found that Ms. Tacason intentionally caused injury to Mr. Gray. The state court found that Ms. Tacason knew, based on its prior orders, that she was expected to turn over certain property and yet she refused to do so and, in some instances, vandalized the very property she had been ordered to turn over. Specifically, the state court found:

> Tacason vandalized certain property prior to turning it over to Gray: broken frames, slashed shirts, Gray's face obliterated in keepsake photographs. This destruction of property which at the time was under the clear jurisdiction of this Court was intentional on Tacason's part, intended to interfere with and undermine this Court's orders.

Moreover, the state court found that Tacason:

> . . . failed to divide all of the sports and music memorabilia, concealed some of it from the division process, asserted a bailment on behalf of numerous teams although she only had verification from a very small number of teams, destroyed or damaged property while subject to the jurisdiction of the Court, and failed to produce all of the non-bailment jerseys for division and failed to follow the process set forth by Judge Inge. In each instance, this Court finds that this was done *intentionally, without justification* and with the clear purpose of avoiding, circumventing and in fact defying the Orders of this Court.

(emphasis supplied) (footnote omitted).

20

Although the state court did not expressly find that Ms. Tacason intended to injure Mr. Gray, the court's findings establish that injury to Mr. Gray was substantially likely to occur and, in fact, by not complying with the court's orders, Ms. Tacason deprived Mr. Gray of the property the court was attempting to divide between them.   Ms. Tacason's intent to interfere with and deprive Mr. Gray of his right to the jerseys and other memorabilia was manifestly clear from the state court's findings.   Thus, the state court's findings satisfy the willfulness requirement of § 523(a)(6).   See In re Levasseur, 737 F.3d at 818 ("Willfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question.") (citation omitted) (internal quotations omitted).

In addition, the state court found that Ms. Tacason ignored its orders "intentionally, without justification . . . [w]ith no attempt to comply or showing of inability to comply."   Thus, the bankruptcy court's findings satisfy the malice requirement of § 523(a)(6).   See id. ("An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.") (citation omitted) (internal quotations omitted).

Thus, the bankruptcy court did not err in determining that the state court's rulings established the necessary elements of § 523(a)(6).

### C.    Causal Connection Between Conduct and Damages

Ms. Tacason argues the bankruptcy court erred in excepting the debt she owed to Mr. Gray from discharge because there was no causal connection between her alleged willful and malicious conduct and the damages awarded by the state court.   According to Ms. Tacason, even if her conduct was willful and malicious, the Damages Order had no correlation with her

conduct.   Rather, its effect was simply to place a dollar amount or quantify the value of the items and memorabilia that the Settlement Agreement contemplated would be divided between the parties.   In other words, the debt which Mr. Gray seeks to be held nondischargeable arose from the underlying causes of action asserted in the 2007 and 2009 Litigations, not from the state court's finding Ms. Tacason in contempt.

We disagree with Ms. Tacason's argument that the award of damages had no connection to the state court's contempt finding.   The state court found Ms. Tacason in contempt and, as a sanction, entered a default judgment against her and dismissed her counterclaims.   The court then held a hearing to assess damages on Mr. Gray's claims and awarded damages to Mr. Gray as a sanction for Ms. Tacason's contemptuous conduct.   The damages award was designed to compensate Mr. Gray for the injuries he sustained as a result of that conduct.   Thus, the Massachusetts Judgment arose from a monetary sanction for Ms. Tacason's contempt rather than a pre-existing debt owed to Mr. Gray.

"The purpose of civil contempt proceedings is remedial, and the formulation of the remedy is within the judge's discretion."   Eldim, Inc. v. Mullen, 710 N.E.2d 1054, 1058 (Mass. 1999) (citation omitted) (internal quotation marks omitted); see also Labor Relations Comm'n v. Fall River Educators' Ass'n, 416 N.E.2d 1340, 1347 (Mass. 1981) ("Unlike a criminal contempt which is punitive, to vindicate the authority of the court, a civil contempt order is intended to be remedial and for the benefit of an aggrieved party.").   "For this reason, both compensatory and coercive orders are considered to be in the nature of civil contempt."   Labor Relations, 416 N.E.2d at 1347 (citing United States v. United Mine Workers, 330 U.S. 258, 303-304 (1947)).

22

Damages assessed in a judgment for civil contempt may be compensatory, i.e. paid to the complaining party to compensate him for the losses suffered because of the disobedience of a court's order.   See id. ("Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience.") (citation omitted) (internal quotations omitted).

As it happens, the orders of the state court which Ms. Tacason chose to disobey and which resulted in the Contempt and Damages Orders relate closely to the claims asserted by Mr. Gray in his complaints in the 2007 and 2009 Litigations.   That coincidence, however, does not transform an otherwise nondischargeable award of damages for contempt into a dischargeable judgment.

## **CONCLUSION**

The bankruptcy court's judgment in favor of Mr. Gray on his claim that the debt is nondischargeable under § 523(a)(6) is **AFFIRMED**.

23